# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**PA AVIACE LTD**, a foreign corporation,
formerly known as Aviace AG and Aviace Ltd.,

        Plaintiff,

    vs.                                         No. **CIV 06-929 MCA/RHS**

**ECLIPSE AVIATION CORPORATION**,
a Delaware Corporation,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Plaintiff PA Aviace Ltd.'s *Application for Temporary Restraining Order and/or Preliminary Injunction* [Doc. 2] filed on September 29, 2006.  The Court held an *ex parte* hearing with Plaintiff's counsel at 5:09 p.m. on Friday, September 29, 2006, at which time the Court denied Plaintiff's *Application for Temporary Restraining Order*.  [Doc. 5, 6.]  After Defendant Eclipse Aviation Corporation was afforded notice and an opportunity to file a written response to Plaintiff's application for a preliminary injunction [Doc. 11, 12, 19], the Court held additional hearings on the following dates:  October 26, 2006; November 3, 2006, and November 6, 2006.  These additional hearing dates were required in order to provide the parties with a full and fair opportunity to present their evidence.

This case involves PA Aviace's request for a preliminary injunction against Eclipse Aviation.  "A district judge asked to decide whether to grant or deny a preliminary injunction

must choose the course of action that will minimize the costs of being mistaken." <u>Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.</u>, 780 F.2d 589, 593 (7th Cir. 1986). Here the harms that would befall Eclipse if a preliminary injunction is erroneously granted far outweigh the harm to Aviace if the preliminary injunction is erroneously denied, and Aviace has not shown a substantial likelihood of prevailing on the merits of any of its claims.

Having considered the parties' submissions, the arguments and evidence presented at the hearings on this matter, the relevant law, and being otherwise informed in the premises, the Court denies Plaintiff's application for a preliminary injunction based on the findings of fact and conclusions of law set forth below.

## I.      **FINDINGS OF FACT**

1.      Plaintiff PA Aviace Ltd (Aviace) is a Swiss corporation formerly known as Aviace AG.

2.      Defendant Eclipse Aviation Corporation (Eclipse) is a Delaware corporation that designs and manufactures the Eclipse 500 aircraft and has its principal place of business in Albuquerque, New Mexico.

3.      Eclipse and Aviace are of diverse citizenship, and the amount in controversy in this civil action is greater than $75,000.00.

4.      Aviace AG was formed under Swiss law between March 2002 and April 2002, and later changed its name to PA Aviace Ltd.

5.      The Company was formed for the purpose of purchasing Eclipse 500 Aircraft and for the express purpose of operating a "jet club" system.

2

6.     At the time of its creation, Hilmar Hilmarsson was the Chief Executive Officer (CEO) of Aviace AG and Peter Pfister was the Chairman of the company's Board of Directors.

7.     At all relevant times before and during his tenure as Aviace's CEO, Mr. Hilmarsson was authorized to act on behalf of Aviace and the shareholders, directors, and investors involved in its formation (including Heinz Peier).

8.     Currently, Heinz Peier is Aviace's CEO; he and Felix Amon currently own or have a right to control the majority of the Company's shares.

9.     During the year 2002, Dorothy "Dottie" Hall was Eclipse's Vice President of Marketing and Sales; prior to 2002, Chris Finnoff was employed as Eclipse's Vice President of Sales.

10.     Peter Reed has been Eclipse's Senior Vice President and Chief Financial Officer (CFO) from the Company's formation in 1999 until the present.

11.     In the fourth quarter of 2001, Mr. Hilmarsson and Mr. Finnoff became involved in negotiations for the purchase of Eclipse 500 Aircraft; Ms. Hall and Mr. Reed replaced Mr. Finnoff as Eclipse's sales representatives with respect to the negotiations with Mr. Hilmarsson in the first quarter of 2002.  [Ex. C, D, E, F, G.]

12.     At the time of these negotiations, the parties understood that Mr. Hilmarsson was negotiating as the agent of a company and a group of investors that had not yet been fully formed and funded as a separate legal entity named "Aviace"; both parties agreed that Mr. Hilmarsson would be given the opportunity to assign the agreement he was negotiating

3

to the company he was in the process of forming with the group of investors headed by Mr. Pfister.

13.     Mr. Pfister and the other investors involved in the formation of Aviace (including Mr. Peier) authorized Mr. Hilmarsson to conduct contract negotiations with Eclipse on their behalf.  Neither Mr. Peier nor Mr. Amon participated in these negotiations in any substantive way during Mr. Hilmarsson's tenure as CEO.

14.     During the parties' contract negotiations leading up to the signing of the March 2002 agreement, Eclipse flatly rejected Mr. Hilmarsson's proposals to become a distributor (that is, to acquire distribution rights) or to be able to resell the Eclipse aircraft in Europe; thus, the negotiations focused on Mr. Hilmarsson's plans for a company that would operate a fleet of Eclipse 500 aircraft for use as a "jet taxi" service by "jet clubs" in Europe.

15.     During the course of negotiations leading up to the March 2002 agreement, Mr. Hilmarsson acknowledged and understood that Aviace could not acquire distribution rights to the Eclipse 500 aircraft and could not purchase the aircraft in order to resell them.

16.     Eclipse also flatly rejected Mr. Hilmarsson's requests for a volume discount on the total purchase price of each aircraft; Mr. Hilmarsson eventually accepted the purchase price offered by Eclipse, and the parties' negotiations turned to the payment terms, the number of aircraft, and the delivery schedule for those aircraft.

17.     With regard to the payment terms, everyone involved in the contract negotiations leading up to the March 2002 agreement agreed from the outset that for *each* aircraft, Aviace would need to pay a "Six Month Production Deposit" of 60% of the purchase

4

price six months before the scheduled delivery and the remaining 40% of the purchase price at the time of delivery; this "Six Month Production Deposit" is a common practice in the general aviation industry and was never disputed during the parties' contract negotiations in 2001 and 2002.

18.   The main subject of dispute in finalizing the payment terms between Aviace and Eclipse was the timing and percentage of the "Initial Deposits" that would be due between the time the agreement was signed and the time the Six Month Production Deposit became due; Eclipse wanted an Initial Deposit of 20% of the purchase price for all the aircraft as soon as possible after the agreement was signed, while Mr. Hilmarsson did not want to pay any deposit on the aircraft until the Six Month Production Deposits became due.

19.   Eventually, the parties compromised on the Initial Deposit by requiring Mr. Hilmarsson's company to pay 20% of the purchase price on the first twelve aircraft shortly after the agreement was signed, 10% of the purchase price on the next 50 aircraft twelve months before the third year of production (*e.g.*, January 2005 if the third year of production began in January 2006), and 10% of the purchase price on the remaining 50 aircraft six months later (*e.g.*, July 2005 if the third year of production began in January 2006).

20.   As part of the compromise on the terms of the initial deposits, Mr. Hilmarsson reduced the total number of aircraft included in the agreement from 200 to 112.

21.   With regard to the delivery schedule for the aircraft, the parties to the contract negotiations were in agreement on the delivery of twelve aircraft during the first two years of production (spaced at intervals of five, nine, and twelve months after the start of aircraft

5

deliveries); these first twelve aircraft were designated as the "Early Aircraft."

22.     Mr. Hilmarsson did not want a greater number of Early Aircraft, or a faster delivery schedule for these aircraft, included in the agreement because he anticipated that there would be technical, regulatory, or logistical problems with the Early Aircraft (such as lack of European certification) that would prevent his company from making full use of these aircraft in the planned "jet taxi" or "jet club" business during the first year or two after Eclipse began production.

23.     Mr. Hilmarsson's plan was to use the Early Aircraft primarily for demonstration purposes during the early phases of his company's "jet taxi" or "jet club" business.

24.     Mr. Hilmarsson did not want to take delivery of the remaining 100 aircraft until later years, after the technical, regulatory, and logistical problems with the Early Aircraft had been settled; thus, the parties' contract negotiations did not contemplate delivery of any of the remaining 100 aircraft until at least two years after Eclipse delivered the first aircraft to its first customer.

25.     During the negotiations in 2001 and the first quarter of 2002, Mr. Hilmarsson never discussed or requested that Eclipse assign serial numbers or production-sequence numbers to any of the 112 aircraft included in the parties' agreement, nor did Eclipse offer to provide such numbers as part of the agreement.

26.     Serial numbers or production-sequence numbers were not important to Mr. Hilmarsson at the time of the contract negotiations because the viability of the "jet taxi" or

"jet club" business he and his associates were planning did not depend on having such numbers included in the parties' agreement so far in advance of production; rather, the viability of this business depended on having specific quantities of aircraft delivered in a particular sequence of dates running from the time aircraft deliveries began.

27.     Eclipse did not offer to provide serial numbers or production-sequence numbers in the parties' agreement because the details of the company's production schedule and production capabilities had yet to be worked out at the time the agreement was negotiated, and Eclipse had yet to receive Federal Aviation Administration (FAA) certification for the Eclipse 500 aircraft; thus, Eclipse was not yet in a position to begin production of any aircraft at that time.

28.     Since there were no Eclipse aircraft in production when the parties negotiated their agreement, any serial number or production-sequence number in existence at that time would not correspond to any tangible property that prospective customers such as Aviace could use as collateral for purposes of obtaining financing on a particular aircraft during that period.

29.     Insofar as the parties' contract negotiations contemplated a "jet taxi," "jet club," or fractional ownership business rather than a distributorship, dealership, or brokerage, there was no urgent need for Mr. Hilmarsson or Aviace to have a set of serial numbers or production-sequence numbers available for use in marketing or reselling any of the aircraft contemplated in these negotiations.

30.     Shortly before finalizing the agreement in March 2002, Mr. Hilmarsson

notified Eclipse of the formation of Aviace AG, and the parties substituted Aviace AG for Mr. Hilmarsson's name wherever it appeared in the body of the agreement.

31.     Aviace AG's board of directors and shareholders (including Mr. Peier) authorized Mr. Pfister and Mr. Hilmarsson to sign the agreement on behalf of Aviace AG, thereby forming a legally binding contract with Eclipse for the purchase of 112 aircraft under the terms and conditions stated therein.

32.     The final agreement resulting from the parties' negotiations in the first quarter of 2002 is memorialized in a letter dated March 11, 2002, from Dottie Hall to Hilmar Hilmarsson (the March 2002 agreement).

33.     In the first paragraph of the March 2002 agreement, Eclipse agrees to sell 112 of its Eclipse 500 aircraft to Aviace's predecessor, Aviace AG, "for the express purpose of launching a fractional ownership program in Europe;" such a "fractional ownership program" is substantially similar, if not identical, to the "jet taxi" or "jet club" concept articulated by Mr. Hilmarsson.  [Ex. 1, H.]

34.     The terms and conditions of Eclipse's March 2002 agreement define the quantity of aircraft which Aviace AG commits to order, the delivery schedule (by month) for each aircraft, the price to be paid per aircraft (including future adjustments), the payment terms (including the amounts and timing of deposits), the consequences of either party's cancellation or breach of their agreement with respect to each aircraft ordered, and procedures for dispute resolution.

35.     According to the tentative delivery schedule included in the March 2002

agreement, Eclipse was to deliver to Aviace AG a total of four aircraft in 2004, eight aircraft in 2005, and the remaining 100 aircraft in 2006; this tentative delivery schedule assumed that Eclipse would receive FAA certification for the aircraft in December 2003 and that aircraft deliveries would begin in January 2004.  [Ex. 1, H.]

36.   The March 2002 agreement contains the following language concerning the price of each aircraft and future price adjustments:

> The price to be paid for the Eclipse 500 aircraft will be $837,500 per aircraft delivered, in June 2000 dollars and subject to adjustments including certain List Price changes and Economic Price Adjustments ("EPA") as defined in the Sterling Deposit Program (*e.g.*, price guarantees, etc.)  The $837,500 price is for the standard Eclipse 500 aircraft, as defined in the Sterling Deposit Program.  Any optional equipment, maintenance or spare parts will be subject to separate negotiation and agreement.

> Eclipse Aviation Corp. ("Eclipse") will grant Aviace AG a "Most Favored Customer" ("MPC") guarantee on all aircraft, optional equipment, maintenance and spare parts (and related agreements) between the parties whereby the price to Aviace AG will not exceed, and the terms for Aviace AG will not be more onerous than, the price(s) and terms which may be granted by Eclipse to any other customer purchasing (or proposing to purchase) aircraft in similar or smaller quantities and under similar terms.

[Ex. 1, H.]

37.   The March 2002 agreement contains the following language concerning the amount and timing of Aviace's payments to Eclipse:

> Aviace AG will place a non-escrowed deposit (the "Initial Deposit") with Eclipse equal to 20% of the List Price for each of the twelve (12) Early Aircraft to be delivered before 2006.  The Initial Deposit for the twelve (12) early aircraft is US $2,010,000 (20% of $837,500 X 12).  The Initial Deposit will be paid to Eclipse within 30 days after this agreement is signed.

> In January 2005, Aviace AG will deposit with Eclipse 10% of the

9

projected delivery price for aircraft to be delivered in January through June 2006. In July 2005, Aviace AG will deposit with Eclipse 10% of the projected delivery price for aircraft to be delivered in July through December 2006.

Additionally, six months prior to each aircraft delivery, Aviace AG will increase the deposit by 50% to a total deposit of 60% (the "Six Month Production Deposit"). For example, in July 2005 Aviace AG will place an additional deposit of 50% of the projected delivery price for the aircraft scheduled to be delivered in January 2006.

The remaining balance of the projected delivery price is due upon actual delivery to Aviace AG of the aircraft purchased.

In the event Eclipse Aviation becomes aware of delays in its delivery schedule to Aviace AG prior to deposits being placed, it will advise Aviace AG and defer deposits by the same amounts as the delay. For example, if Eclipse became aware in December 2004 that it would deliver only 50% of the aircraft scheduled for Aviace AG in January through June 2006, then the January 2005 deposit would be decreased by 50%. However, in no event will deposits, once made, be refunded to Aviace AG except under the cancellation provisions of this agreement.

[Ex. 1, H.]

38. Aviace AG paid Eclipse the initial deposit of $2,010,000 on the twelve Early Aircraft within the time frame contemplated in the March 2002 agreement; the funds for this initial deposit came from the group of individuals who invested and purchased shares in Aviace AG at the time of its formation, and did not require Aviace AG to obtain financing from a bank.

39. In the months immediately following the signing of the March 2002 agreement, Mr. Hilmarsson began marketing Aviace's planned "jet taxi" or "jet club" business to potential customers; these marketing efforts included the development of a website advertising the company as "a Switzerland-based, international private jet club." [Ex. BBB.]

10

40.     In the Summer of 2002, after the March 2002 agreement was signed and Mr. Hilmarsson had begun his efforts to market the "jet club" idea, there was discussion among Aviace's board of directors about hiring a different CEO in place of Mr. Hilmarsson.

41.     In August 2002, Mr. Hilmarsson stepped down as Aviace's CEO and transferred any shares he held in the company to Mr. Pfister; another Aviace shareholder, Wilfried "Willie" Koeck, replaced Mr. Hilmarsson as Aviace's CEO during that time period.

42.     In August 2002, at Mr. Hilmarsson's last Aviace board meeting, the Board first discussed looking into reselling the aircraft it expected to purchase from Eclipse.

43.     In a letter to Eclipse dated August 2, 2002 (with the year listed as "2001" due to a typographical error), Mr. Koeck attempted to engage Eclipse in negotiations over distribution or resale rights in Europe and the purchase of additional aircraft; in that letter, Mr. Koeck also requested that Eclipse provide serial numbers corresponding to the tentative delivery schedule contained in the March 2002 agreement.  [Ex. 5.]

44.     The reason Mr. Koeck gave Eclipse for making this request for serial numbers was that Aviace's bank needed this information in order to review Aviace's application for bank financing, and Aviace's bank financing was the sole purpose for which Eclipse ever provided this type of information to Aviace at any time before Eclipse sent Aviace the invoice for the Six Month Production Deposit on the first aircraft.  [Ex. 5, 9.]

45.     In a letter to Mr. Koeck dated August 4, 2002, Ms. Hall rejected Aviace's request to become a distributor or reseller of Aviace aircraft, as well as Aviace's request to purchase additional aircraft on the same terms as earlier purchase set forth in the March 2002

agreement.  [Ex. 6, O.]

46.    Mr. Koeck replied to Ms. Hall's letter in an e-mail message dated August 12, 2002, in which he reiterated his request for "[a]ssigned aircraft serial numbers" and an additional purchase agreement.  [Ex. 7.]

47.    In a fax transmittal from Ms. Hall to Mr. Hilmarsson and Mr. Koeck dated August 13, 2002 (the August 2002 fax transmittal), Eclipse provided Aviace with "production sequence numbers for its 2004 and 2005 aircraft"; under this production sequence, the 31st aircraft manufactured by Eclipse was tentatively identified as the first aircraft delivered to Aviace.  [Ex. 8, R.]

48.    The August 2002 fax transmittal also stated that:  "Upon reviewing our agreement, I find that it was not intended to be a preliminary agreement, but rather to define the entire relationship between our two parties.  Given this, we do not see a need to create a subsequent agreement."  [Ex. 8.]

49.    The March 2002 agreement is the "agreement" referenced in Ms. Hall's August 2002 fax transmittal; thus, Eclipse intended the March 2002 agreement "to define the entire relationship between" Eclipse and Aviace as of the latter date.

50.    Mr. Koeck confirmed that he shared this understanding of the March 2002 agreement in a letter to Eclipse dated August 19, 2002 (with the date listed as "2001" due to a typographical error).  [Ex. 9.]

51.    In a second fax transmittal from Ms. Hall to Mr. Koeck dated September 4, 2002 (the September 2002 fax transmittal), Eclipse provided Aviace with "production

sequence numbers for Aviace's aircraft in 2006" and advised Aviace that "these numbers could change, if we change production rate for 2006."   [Ex. 10, U.]

52.     In a subsequent fax transmittal dated June 24, 2003, Eclipse again provided Aviace with the production-sequence numbers listed in Ms. Hall's prior fax transmittals. [Ex. 20.]

53.     The correspondence between Eclipse and Aviace concerning production-sequence numbers did not have the effect of modifying or adding to the terms and conditions of the March 2002 agreement; Aviace did not provide Eclipse with any consideration for providing these production-sequence numbers, nor did Eclipse accept Aviace's requests for production-sequence numbers as a modification or amendment of the March 2002 agreement.

54.     Eclipse did not receive FAA certification in December 2003 or begin deliveries of aircraft in January 2004 as contemplated in the tentative delivery schedule set forth in the March 2002 agreement; rather, FAA certification occurred on September 30, 2006, and Eclipse is scheduled to begin deliveries of the Eclipse 500 aircraft after that date.

55.     The change in the FAA certification date was precipitated by the need to find a different engine for the Eclipse 500 aircraft, which delayed production of the aircraft for more than two years.

56.     Aviace had already begun changing its business plan from a "jet club" concept to a distributorship or resale concept before receiving notice of Eclipse's plans for an engine change.

57.     During the delay occasioned by the engine change, Eclipse also made plans to

increase the production rate for its aircraft so that more aircraft could be produced in a shorter time period; these plans came to fruition after Eclipse had provided production-sequence numbers to Aviace for purposes of bank financing.

58.    Neither the March 2002 agreement nor any of the parties' correspondence regarding production-sequence numbers gave Aviace the right to control Eclipse's production rate or prohibit Eclipse from increasing its production rate.

59.    Eclipse's plans for an increase in its production rate necessitated a change in the production-sequence numbers previously provided to Aviace, because if Aviace kept those production-sequence numbers under the new production rate, then Eclipse would be in a position to deliver more Early Aircraft to Aviace and to demand earlier deposits from Aviace than the parties had bargained for in the March 2002 agreement.

60.    Keeping the same production-sequence numbers under the increased production rate would be contrary to the parties' intent with respect to the March 2002 agreement, because Mr. Hilmarsson specifically bargained for a delivery schedule that would avoid a large number of Early Aircraft during the first two years of production and for a deposit schedule that would delay the first Initial Deposit on the remaining 100 aircraft until twelve months before the third year of production.

61.    The change in the FAA certification date and production rate did not destroy the viability of the parties' March 2002 agreement, however, because that agreement also contains provisions addressing the parties' rights and responsibilities in the event that the tentative delivery schedule for the aircraft changed.

14

62.    Under these provisions, the delivery schedule for the 112 aircraft covered by the March 2002 agreement is triggered by the date when Eclipse delivers its first production aircraft to its first customer; in other words, Eclipse is to deliver to Aviace four aircraft within the first year after deliveries start, eight aircraft within the second year after deliveries start, and the remaining 100 aircraft within three years after deliveries start.

63.    In addition, the March 2002 agreement allowed the deposits Aviace was scheduled to make in 2004 and 2005 to be deferred until a later date in order to correspond with the changes in the delivery schedule.

64.    The March 2002 agreement also provides that: "Aviace AG will have the right to request and receive a full refund of its cash deposits should Eclipse not achieve the Sterling Deposit Program guarantees (including a guarantee that the List Price will not be increased in excess of 5%) or breach the terms of this Agreement." [Ex. 1, H.]

65.    The Sterling Deposit Program referenced in the March 2002 agreement allows for a full refund "only if Final Delivery Price exceeds List Price (as adjusted for CPI-W) by 5%, OR Standard Equipment List has been shortened OR Guaranteed Performance Specifications are not met, OR FAA Certification occurs after December 31, 2004." [Ex. C.]

66.    In accordance with these provisions, Eclipse twice offered Aviace a full refund of its cash deposits when FAA Certification did not occur on December 31, 2004, and when changes to the aircraft's engine resulted in a price increase greater than 5% (as adjusted for CPI-W); Aviace elected not to accept these refunds, and thus with the exception of the price

15

increases, the March 2002 agreement remained in effect after Eclipse made these refund offers.

67.     The March 2002 agreement also defines the parties' respective rights and responsibilities in the event that Aviace canceled its order for a particular aircraft or group of aircraft.

68.     Under these cancellation provisions, Aviace agreed to forfeit as liquidated damages the advance deposit it paid on a particular aircraft in the event that Aviace canceled its order for that aircraft after paying the deposit, unless Eclipse chose to waive or partially waive this cancellation penalty.

69.     The cancellation provisions of the March 2002 agreement also state that "Aviace AG shall have the right to assign its aircraft purchase (and related rights) to a third-party purchaser."  [Ex. 1, H.]

70.     The language allowing Aviace AG to assign aircraft to a third-party purchaser was included in the March 2002 agreement primarily in order to facilitate Aviace AG's transfer of its contractual rights to a successor corporation, such as PA Aviace Ltd.; this language also might be interpreted to allow Aviace to avoid cancellation penalties by assigning its contractual rights to a third party that is able to pay the required deposit in the event that Aviace cannot pay that deposit.

71.     The assignment language in the March 2002 agreement is not intended to give Aviace full rights to act as a distributor, dealer, or reseller of Eclipse's aircraft, nor is this language intended to alter the express purpose of that agreement, which is for Aviace to

16

launch a fractional ownership or "jet club" program in Europe.

72.   Although some of Aviace's initial shareholders sold their shares to other investors and the composition of the company's officers and board of directors has changed over the years, there is no credible evidence that these changes in Aviace's personnel and corporate governance modified the March 2002 agreement, precipitated a refund of Aviace's initial deposit, or created an unlimited right to assign the purchase of individual aircraft to third parties.

73.   In a memorandum from Mr. Koeck to Eclipse dated July 7, 2005 ("July 2005 memorandum"), Aviace accepted Eclipse's request for an increase in the List Price from $950,000 to $1,045,000 per aircraft.  [Ex. D to Doc. 16.]

74.   This language in the July 2005 memorandum constitutes an amendment to the List Price of $837,500 per aircraft stated in the March 2002 agreement but remains consistent with the refund and pricing provisions of the Sterling Deposit Program referenced therein, which allow for adjustments to the List Price under certain circumstances and contemplate a difference between the List Price and the Final Delivery Price established six months prior to aircraft delivery.  [Ex. C.]

75.   The July 2005 memorandum also states that:  "Our agreement in this respect obviously does not affect any other terms and conditions contained in our Purchase Agreement dated March 11, 2002, nor any subsequent agreement between us including but not limited to aircraft delivery sequence numbers assigned to Aviace Ltd, all of which remain in full force and effect."  [Ex. D to Doc. 16.]

17

76.     There is, however, no subsequent agreement between Eclipse and Aviace concerning aircraft delivery sequence numbers assigned to Aviace; Eclipse only provided the production sequence numbers to Aviace as a courtesy for the limited purpose of facilitating Aviace's bank-financing efforts.

77.     In May 2006, Mr. Peier replaced Mr. Kueck as the CEO of Aviace; Mr. Peier had been a shareholder in Aviace from the date of its formation, but he did not assume a leadership position in the company until several years after the March 2002 agreement was signed.

78.     On or about June 22, 2006, Eclipse sent Aviace an invoice for an aircraft with production-sequence number 78; this invoice was later withdrawn with no penalty to Aviace, because it was based on Eclipse's mistaken assumptions concerning an FAA certification date and/or a possible renegotiation of the agreement with Aviace that was never finalized. [Ex. 27.]

79.     On or about August 25, 2006, Eclipse sent Aviace a letter and an invoice dated August 23, 2006, requesting that Aviace pay an additional deposit of $634,305.95 by no later than September 8, 2006, for an aircraft with production-sequence number 47; the amount of this invoice reflected 60% of the final delivery price.  [Ex. 30, C; Ex. 1 to Doc. 9.]

80.     Eclipse's stated rationale for requesting this additional deposit was that Eclipse anticipated delivering the first aircraft to Aviace in January 2007, and under the terms of the parties' agreement, Aviace was required to bring its deposit up to 60% of the final delivery price for that aircraft six months before the scheduled delivery date.  [Ex. 1 to Doc. 9.]

18

81.    In a letter to Eclipse dated September 1, 2006, Aviace objected to the price increase reflected in the invoice and also raised the issue of whether the 47th aircraft in Eclipse's production sequence (as referenced in Eclipse's August 2006 invoice) "is a replacement for Serial Number 30" or another number that appeared on the lists Eclipse provided in 2002 and 2003.  [Ex. 2 to Doc. 9.]

82.    In a letter to Aviace dated September 5, 2006, Eclipse disputed Aviace's objection to the July 2005 price increase and confirmed that the 47th aircraft in its production sequence is "the first scheduled aircraft delivery for Aviace."  [Ex. 3 to Doc. 9.]

83.    In a letter to Aviace dated September 13, 2006, Eclipse gave notice that it considered Aviace to be in breach of the parties' contract because Aviace did not pay the requested deposit of $634,305.95 by September 8, 2006.  [Ex. 35; Ex. 4 to Doc. 9.]

84.    Eclipse's letter of September 13, 2006, references a letter from Aviace's attorney, William Arland, disputing Eclipse's request for an additional deposit for the first aircraft and requesting non-binding arbitration.

85.    The March 2002 agreement contains the following provisions regarding dispute resolution:

> Eclipse and Aviace AG agree that the courts of the United States and the State of New Mexico shall have jurisdiction over the relationship between the parties with regard to any dispute arising from this agreement.  This and any subsequent agreements between the parties shall be interpreted by the laws of the State of New Mexico.

> Eclipse and Aviace AG agree to mutually try to solve any business disputes by amicable discussions between the two parties.  Prior to utilizing the courts per above, the parties agree to seek non-binding arbitration to solve

any issues which can not be resolved by Eclipse and Aviace AG.

[Ex. 1, H.]

86.     In a letter dated September 19, 2006, Eclipse declined Mr. Arland's request for non-binding arbitration but reiterated a prior offer to "negotiate an orderly termination of the Purchase Agreement before Aviace breaches further payment obligations and incurs additional liability."  [Ex. 36.]

87.     On September 29, 2006, Aviace filed this civil action and sought a temporary restraining order.

88.     In its request for a temporary restraining order,  Aviace did not ask for limited relief such as an order requiring the parties to conduct non-binding arbitration as provided in the March 2002 agreement or an order directed at the payment or delivery terms for one particular aircraft; rather, Aviace requested that the Court enforce Aviace's interpretation of the March 2002 agreement in its entirety with respect to all 112 aircraft and the full term of the three-year delivery schedule.  [Doc. 2.]

89.     At the *ex parte* hearing on Aviace's request for a temporary restraining order, Aviace's counsel represented that the provisions of the parties' agreement that are now in dispute include (a) whether the March 2002 agreement was modified or amended to include the specific production-sequence numbers referenced in the August 2002 fax transmittal and/or the September 2002 fax transmittal, and (b) whether the payment provisions of the March 2002 agreement obligate Aviace to bring its deposit up to 60% of the total purchase price for *each* aircraft six months before the scheduled delivery of that aircraft, or whether

the first twelve aircraft are exempt from this 60% advance-deposit requirement; Aviace's counsel did not, however, dispute that the March 2002 agreement was modified or amended to include the price increase reflected in the July 2005 memorandum.  [Tr. 9-29-06.]

90.     As of the date this action was filed, Aviace has not paid the additional deposit requested in Eclipse's August 2006 invoice.

91.     As of the date this action was filed, Eclipse has not cancelled the March 2002 agreement in its entirety or threatened to withhold Aviace's entire Initial Deposit payment; rather, Eclipse only invoked the cancellation provisions with respect to the Six Month Production Deposit on the first aircraft delivery and indicated it was retaining the initial deposit payment of $167,500 as liquidated damages for the cancellation of the first aircraft. [Ex. 35.]

92.     As of this date, Aviace remains current on its deposit payments for the remaining 111 aircraft under the delivery schedule contemplated in the March 2002 agreement, and Eclipse does not have any outstanding or past-due invoices for any additional deposit payments on these 111 aircraft.

93.     When Eclipse was served with the *Complaint* in this action during the first week of October 2006, Mr. Reed visited and obtained a copy of Aviace's publicly available website; as of the first week of October 2006, Aviace's website had changed dramatically from the 2002 version developed by Mr. Hilmarsson.  [Ex. AAA, BBB.]

94.     Instead of portraying the company as a "Switzerland-based, international private jet club," the Aviace website accessed by Mr. Reed during the first week of October

21

2006 identifies "Aviace Aviation" as "the leading Eclipse 500 sales firm" offering "the most diverse and lowest priced inventory of Eclipse 500 early delivery positions in the industry." [Ex. AAA.]

95.    The Aviace website accessed by Mr. Reed in October 2006 also lists a purchase price of $1,650,000.00 for Eclipse 500 aircraft and various payment terms under which a deposit of at least 65% of the purchase price is due seven months before delivery of the aircraft.  [Ex. AAA]

96.    These terms reflect a higher price, a higher deposit amount, and an earlier deposit schedule than Aviace's March 2002 agreement with Eclipse, and thus if an Aviace customer agreed to the terms on Aviace's website, Aviace would already have received sufficient funds to pay Eclipse's Six Month Production Deposit before that deposit became due under the March 2002 agreement.  [Ex. AAA, H.]

97.    Much of the information about the Eclipse 500 aircraft posted on the October 2006 Aviace website that Mr. Reed accessed is copied verbatim from the Eclipse website; Aviace's marketing efforts offer no independent technical expertise or aftermarket features for the Eclipse 500 aircraft that a potential customer could not obtain directly from Eclipse itself.  [Ex. BB, AAA.]

98.    At the hearings concerning Aviace's application for a preliminary injunction, Mr. Peier and Mr. Amon testified that the October 2006 Aviace website accessed by Mr. Reed was merely a "draft" and was not supposed to have been available to the public as of that date; they attributed the mistake in making the draft website available to the public to

their having outsourced the task to website developers (whom they described as "computer geeks"), and they indicated that the Aviace website subsequently was "turned off" so it is no longer accessible to the public.

99.    Mr. Amon only recently (October 2006) initiated the process of acquiring shares in Aviace and did not have any involvement in negotiating the March 2002 agreement with Aviace or obtaining production-sequence numbers from Aviace.

100.    Both Mr. Peier and Mr. Amon are personally involved in the real-estate business and in the business of selling general aviation aircraft; however, there is no evidence that Aviace, as a company, has any prior track record or established customer base in the area of real estate, aircraft sales, "jet clubs," "jet taxis," or similar fractional-ownership businesses.

101.    Apart from Mr. Hilmarsson's initial efforts to establish a business plan for a "jet club," there is no evidence that Aviace has taken any steps to develop or operate a "jet club," "jet taxi," or fractional-ownership business as contemplated in the March 2002 agreement and the surrounding contract negotiations from that period.

102.    There is also no evidence that Aviace has established itself as an independent aircraft distributor, dealer, or broker; Eclipse has consistently rejected Aviace's requests for distribution rights in the Eclipse 500 aircraft.

103.    Further, Aviace has not shown that it has ever contracted to purchase any other aircraft besides the 112 Eclipse 500 aircraft listed in its March 2002 agreement with Eclipse; Eclipse has consistently rejected Aviace's requests to purchase additional aircraft.

104.    Aviace remains a startup company formed and maintained for the purpose of holding the right to purchase 112 Eclipse 500 aircraft as specified in the March 2002 agreement; Aviace has no employees or facilities beyond the minimum amount of resources needed to administer the corporation on paper.

105.    Aviace does not have firm contracts for the resale of Eclipse 500 aircraft to any of Aviace's prospective customers.

106.    A precondition to Aviace's formation of such resale contracts with prospective customers is that Aviace can prevail on its interpretation of its March 2002 agreement with Eclipse.   This precondition has not been satisfied.

107.    Under these circumstances, Aviace has not shown that it will suffer immediate and irreparable injury, loss, or damage before the merits of this action can be fully heard.

108.    Aviace is not immediately and irreparably harmed by Eclipse's request for the Six Month Production Deposit on the first aircraft because Aviace has not paid that deposit yet.

109.    Aviace is not immediately and irreparably harmed by Eclipse's reassignment of production-sequence numbers (*e.g.*, the substitution of No. 47 for No. 31) because Aviace never had (or justifiably relied to its detriment upon) a contractual right to a particular production-sequence number, and Eclipse's reassignment of these numbers does not change the delivery schedule contained in the March 2002 agreement.

110.    In this regard, the Court notes that the only purpose for Eclipse's provision of the production-sequence numbers was to facilitate Aviace's bank financing and not to

24

facilitate Aviace's distribution or resale of Eclipse 500 aircraft; further, there is no evidence that Aviace ever used the production-sequence numbers to obtain bank financing or that a bank withdrew such financing due to a change in the production-sequence numbers.

111.   Aviace has not shown that Eclipse canceled the March 2002 agreement in its entirety or canceled delivery of such a substantial portion of the 112 aircraft listed in the agreement that Aviace can no longer go forward with a "jet club" or fractional-ownership business; in this regard, the Court notes Mr. Hilmarsson's testimony that the Early Aircraft (including No. 31 or 47) were intended for demonstration purposes and that he did not expect to make full use of these Early Aircraft until after the technical, legal, and logistical problems were resolved during the early years of the aircraft's production.

112.   To the extent there are any legitimate differences over the total price or payment terms for the aircraft, Aviace has an adequate remedy at law because it is possible to calculate the differences among Aviace's claimed purchase price, Eclipse's claimed purchase price, and the price for which Aviace would be able to resell a particular aircraft that is delivered at a particular time.

113.   The balance of hardships between the parties also does not weigh in favor of granting the preliminary injunction requested by Aviace.

114.   Eclipse may suffer substantial harm if Aviace's application for a preliminary injunction is issued because unlike Aviace, Eclipse has firm contracts for the sale of over 2500 aircraft and has already invested hundreds of millions of dollars and hired numerous employees in order to perform on those contracts; Aviace's interpretation of the March 2002

25

Agreement will disrupt Eclipse's contracts with other customers and require major changes to Eclipse's production schedule, deployment of employees, and financing.

115.    In particular, the preliminary injunctive relief requested by Aviace would require Eclipse to reassign its production-sequence numbers from other customers to Aviace, thereby causing major harm to Eclipse's goodwill with other customers and requiring Eclipse to rearrange its entire production schedule for the next three years.

116.    The specific production-sequence numbers requested in Aviace's application for a preliminary injunction would require Eclipse to either (1) decrease its production rate so that those production-sequence numbers coincided with the delivery schedule in the March 2002 agreement, or (2) build the 112 aircraft claimed by Aviace at an earlier date, without the benefit of additional deposit payments from Aviace, and then store and finance them until the delivery dates specified in that agreement.

117.  Both horns of this dilemma are likely to inflict major financial and logistical harm on Eclipse, because a decreased production rate would throw off the company's delivery schedule to other customers, and building Aviace's aircraft at an earlier date without the benefit of additional deposit payments would require Eclipse to incur storage and financing charges while it awaited the delivery dates specified in the March 2002 agreement with Aviace.

118.    This case involves a private commercial dispute that does not implicate large numbers of the general public, and therefore the public interest does not weigh in favor of granting a preliminary injunction.

26

119.    To the extent there is any public involvement in this dispute, the public interest weighs in favor of denying the application for preliminary injunction, because Aviace is essentially a paper corporation with no full-time employees or established customer base, while Eclipse has over 2,500 customer orders in place and has a substantial number of employees who would be adversely affected if Eclipse were to lose business with other customers or rearrange in production schedule due to the preliminary injunctive relief Aviace is requesting in this action.

## II.    LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A.    Jurisdiction

This action arises from a contract dispute involving, among other things, whether Plaintiff is entitled to purchase the 31st aircraft manufactured in Defendant's production sequence, and whether Plaintiff is required to pay an additional deposit of $634,305.95 on that purchase six months before taking delivery of the aircraft.  The parties are of diverse citizenship, and the amount in controversy is greater than $75,000.00.  In this civil action, neither party has invoked any language in the contract which requires adjudication in another forum.  Therefore, this Court has jurisdiction over the subject matter of this controversy at this juncture pursuant to 28 U.S.C. § 1332.

### B.    Standard of Review

Both parties have been afforded the opportunity to present evidence and brief the issues raised by Plaintiff's application for a preliminary injunction.  Accordingly, the procedural requirements for issuing a temporary restraining order under Fed. R. Civ. P.

27

65(b), which the Court addressed in a prior *Order* [Doc. 5], no longer apply in this case. Instead, the Court now focuses its inquiry on whether there are grounds for issuing a preliminary injunction pursuant to Fed. R. Civ. P. 65(a).

In the absence of a specific statute that "clearly provides otherwise," the Court evaluates Plaintiff's motion according to traditional equitable principles governing the issuance of preliminary injunctions.   United States v. Oakland Cannabis Buyers' Cooperative, 532 U.S. 483, 496 (2001).  Under these principles, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law." Northern Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984) (citing Hillsborough v. Cromwell, 326 U.S. 620, 622 (1946)); accord Sweeten v. Sneddon, 463 F.2d 713, 715 (10th Cir. 1972); Robbins v. Budke, 739 F. Supp. 1479, 1484 (D.N.M. 1990).  In order to establish grounds for preliminary injunctive relief, a movant generally must show that it will suffer irreparable injury unless the injunction issues; that the threatened injury to the movant outweighs the harm the injunction may cause to others; that the injunction, if issued, would not be adverse to the public interest; and that there is a substantial likelihood that the movant will succeed on the merits.  See Elam Constr., Inc. v. Reg'l Transp. Dist., 129 F.3d 1343, 1346-47 (10th Cir. 1997); 13 James Wm. Moore, Moore's Federal Practice § 65.22[1][a], at 65-41 to 65-42 (3d ed. 2003).

The Supreme Court and the Tenth Circuit recently clarified the application of these principles in O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973 (10th Cir. 2004) (en banc), aff'd, 126 S. Ct. 1211 (2006).  In particular, the Supreme Court

28

has clarified that "the burdens at the preliminary injunction stage track the burdens at trial."

Ashcroft, 126 S. Ct. 1211, 1219 (2006).  In this case, Aviace bears the burden of proving at

trial each of the elements of the claims asserted in its *Amended Complaint* [Doc. 16], while

Eclipse bears the burden at trial of proving any affirmative defenses or counterclaims.  Thus,

similar burdens apply to the parties' showings with respect to the likelihood of success on

the merits at the preliminary-injunction stage.  See id. at 1219-20.

It is important to note, however, that Eclipse has not yet filed an *Answer* asserting

affirmative defenses or counterclaims in this action.  Thus, the issue of whether Aviace

breached the contract by, among other things, changing its business plan from a "jet club"

concept to a distribution or resale concept, is not before the Court at this juncture.  Rather,

the focus of the Court's current inquiry is on the alleged breaches asserted by Aviace in its

application for a preliminary injunction.

The Tenth Circuit has identified three disfavored categories of preliminary injunction

for which a movant must satisfy a heightened burden:  "(1) preliminary injunctions that alter

the status quo;  (2) mandatory preliminary injunctions; and (3) preliminary injunctions that

afford the movant all the relief that it could  recover at the conclusion of a full trial on the

merits."  Ashcroft, 389 F.3d at 975.  Requests for preliminary injunctive relief "fitting within

one of the[se] disfavored categories must be more closely scrutinized to assure that the

exigencies of the case support the granting of a remedy that is extraordinary even in the

normal course," and "a party seeking such an injunction must make a strong showing both

with regard to the likelihood of success on the merits and with regard to the balance of

harms." Id. at 975-76.

This test for identifying disfavored categories of preliminary injunctions is not always helpful in the context of a contract dispute, because "[a] plaintiff's view of the status quo is the situation that would prevail if its version of the contract were performed. A defendant's view of the status quo is its continued failure to perform as the plaintiff desires. To a breach of contract defendant, any injunction requiring performance may seem mandatory." Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 34 (2d Cir. 1995). Because I determine that Aviace cannot meet the traditional test for granting a preliminary injunction, I find it unnecessary to determine whether Aviace's application falls into a disfavored category that would implicate the more stringent requirements set forth in Ashcroft, 389 F.3d at 975-76.

## C.    **Irreparable Harm to Aviace**

My analysis of Aviace's application for a preliminary injunction begins with the requirement of showing irreparable harm. "'Because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'" Dominion Video Satellite, Inc.v. Echostar Satellite Corp., 356 F.3d 1256, 1260 (10th Cir. 2004) (quoting Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir.1990)). In Dominion Video Satellite, the Tenth Circuit identified the following factors as relevant to a showing of irreparable harm in the context of a private commercial dispute: "inability to calculate damages, harm to

goodwill, diminishment of competitive positions in marketplace, loss of employees' unique services, the impact of state law, and lost opportunities to distribute unique products." Id. at 1263.

All of the authorities that the Dominion Video Satellite opinion cites to illustrate the application of these factors are distinguishable from the facts of the case at bar. These authorities concern situations where the movant seeking preliminary injunctive relief is invoking exclusivity provisions or do-not-compete clauses in a contract. The cases in which preliminary injunctive relief was granted also involved situations where the plaintiff was an ongoing business with an existing customer base and a reservoir of goodwill stemming from a strong history of past sales.

In that context, it is understandable that the breach of an exclusivity provision or covenant not to compete may result in irreparable harm when the breach causes the non-movant to erode or cut off the movant's existing customer base to a significant degree, thereby putting the very existence of the movant's ongoing business at risk. But in this case, the terms of the parties' agreement do not make Aviace a dealer or distributor of Eclipse's aircraft, nor is Aviace seeking to enforce an exclusivity provision or a do-not-compete clause in its agreement with Eclipse. While the Eclipse 500 model occupies a relatively unique position in the marketplace for small, lightweight jet aircraft, Aviace has not shown that it has a unique right to resell or distribute the Eclipse 500 in any particular segment of that marketplace, or that such aircraft are totally unavailable from other sellers. Aviace also has not shown that it has an established customer base, sales network, or track record which

31

establishes a reservoir of goodwill that could be irreparably injured if Eclipse does not

deliver the first aircraft in accordance with Aviace's interpretation of the parties' agreement.

See Leisure Time Cruise Corp. v. Town of Barnstable, 62 F. Supp. 2d 202, 211 (E.D.N.Y.

1990) ("[A]s a new business, plaintiff has not yet established goodwill or a customer base

in the area . . . .").

Rather, Eclipse is the one claiming that its contract with Aviace prohibits Aviace from

reselling the aircraft in direct competition with Eclipse's sales efforts.  The express purpose

of the parties' March 2002 agreement is to enable Aviace to start a fractional-ownership

business (or "jet club") in Europe using 112  of the Eclipse 500 aircraft.   Aviace has not

shown that the startup of such a business will be irreparable thwarted if by no later than

February 2007 Aviace receives the 47th aircraft in Eclipse's production sequence instead of

the 31st aircraft in that sequence, or if Aviace is required to pay the six-month production

deposit on that aircraft and each subsequent aircraft, or if Aviace is required to pay the price

indicated in the July 2005 memorandum or the August 2006 invoice.

An award of compensatory damages provides an adequate remedy at law for Aviace's

disagreement with Eclipse's pricing, payment terms, or delivery schedule for a particular

aircraft, and Aviace has not shown that the loss or delay with respect to one aircraft (even

if it is the first aircraft) will cause such grave harm as to irreparably destroy the possibility

of ever going forward with its fractional-ownership business.  In this regard, Mr. Hilmarsson

testified that he purposefully structured the March 2002 agreement so as not to receive too

many of the Early Aircraft in the first two years of production, and he did so because he

knew the company would not be able to make full use of these Early Aircraft in a fractional-ownership or jet-club business during the early years of the aircraft's production.

At the hearings on its application, Aviace did not attempt to show irreparable harm to any "jet taxi," "jet club," or fractional-ownership business.  Rather, Aviace concentrated its efforts on showing harm to a variety of potential business ventures undertaken by Mr. Peier and Mr. Amon that were never contemplated in the March 2002 agreement.   These new business ventures undertaken by Mr. Peier and Mr. Aron in 2006 do not form a basis for showing the type of immediate and irreparable harm required to support a preliminary injunction.

The parties' March 2002 agreement specifies that it is to be interpreted according to New Mexico law, and New Mexico's appellate courts appear to follow a modern version of "the rule expressed in the seminal case of Hadley v. Baxendale, 9 Ex. 341, 156 Eng.Rep. 145, 151 (1854), that a party breaching a contract is liable only for such consequential damages as were within 'the  contemplation of both parties' at the time of contracting." Camino Real Mobile Home Park P'ship v. Wolfe, 119 N.M. 436, 446, 891 P.2d 1190, 1200 (1995);   If "the scope of liability is limited to the risks or types of losses which the parties meant his performance to protect against" at the time the contract was formed, 3 Dan B. Dobbs, Dobbs Law of Remedies § 12.4(6), at 91 (2nd ed. 1993), then the measure of irreparable harm in the context of Aviace's request for preliminary injunctive relief should similarly be limited to those harms which the parties meant to protect against in their contracts and representations.  In other words, the immediate and irreparable harm required

33

for preliminary injunctive relief in this context does not include harms that are merely speculative and not reasonably foreseeable from the express terms of the contract or the parties' representations to one another.

In this case, the March 2002 agreement was designed to facilitate a "jet club" or fractional-ownership in which Aviace would own and operate a fleet of 112 Eclipse 500 aircraft; the parties' agreement was not designed to facilitate or protect against harms that might befall Aviace if the company instead decided to resell these aircraft or bundle them with real-estate deals. Similarly, Eclipse's early provision of production-sequence numbers was designed to facilitate Aviace's bank financing for its own purchase, not to facilitate Aviace's efforts to resell the aircraft to other customers. Aviace has shown no irreparable harm to its ability to obtain bank financing resulting from Eclipse's change in the production-sequence numbers.

With respect to the immediacy of the harm, I further find that Aviace already has elected to wait more than four years for the delivery of the first aircraft and has elected not to cancel its order or rescind the March 2002 agreement based on Eclipse's delays and price increases, despite numerous opportunities to accept a refund offer or renegotiate the contract during this period. Aviace's election of remedies during this waiting period is not consistent with an immediate need for delivery of a particular aircraft to satisfy an existing customer base.

To be sure, Aviace might be in a better position to show irreparable injury if Eclipse announced its intention to cancel the March 2002 agreement in its entirety with respect to

34

all 112 aircraft listed therein based solely on Aviace's failure to timely pay the six-month

production deposit on the first aircraft.  But Aviace has shown no immediate threat that

Eclipse will do so. Eclipse's recent correspondence on this subject shows that the

cancellation only affects the deposit on the first aircraft; the remainder of the initial deposit

that Aviace paid in March 2002 remains intact.

Thus, under the terms of the parties' March 2002 agreement, Aviace remains current

on its deposit for the remaining 11 early aircraft, and Eclipse has not demanded additional

deposits on the remaining 111 aircraft at this time.  All that has happened thus far is that

Eclipse substituted production-sequence number 47 for number 31, and Aviace may have lost

$167,500 of its initial deposit along with the right to purchase the first of the 112 aircraft.

Such losses can be adequately calculated and compensated through an award of damages,

and under these circumstances, I conclude that Aviace has not shown the type of immediate

threat of irreparable injury necessary for granting a preliminary injunction in this context.

### D.   <u>Likelihood of Success on the Merits</u>

The parties' March 2002 agreement expressly provides that it is to be  interpreted by

the laws of the State of New Mexico.  [Ex. 1, H.]  New Mexico courts appear to follow the

<u>Restatement (Second) of Contracts</u> and Arthur Corbin's treatise entitled <u>Corbin on Contracts</u>

(1951), with respect to the theory of anticipatory breach of contract asserted here.  <u>See</u>

<u>Gilmore v. Duderstadt</u>, 1998-NMCA-086, ¶ 15, 125 N.M. 330, 961 P.2d 175.  These

authorities provide that:  "To establish a repudiation justifying nonperformance of a

condition of the contract, the plaintiff must be able to show that the defendant's words or

acts evinced 'a distinct, unequivocal, and absolute refusal to perform according to the terms of the agreement.'"  Id.  (quoting Hoggard v. City of Carlsbad, 1996-NMCA-003, ¶ 6, 121 N.M. 166, 909 P.2d 726, and citing Restatement (Second) of Contracts § 250(b) (1981)). "Words or acts which are only 'doubtful and indefinite statements' regarding performance, do not repudiate a contract."  Hoggard, 1996-NMCA-003,  ¶ (quoting 4 Arthur L. Corbin, Corbin on Contracts § 973, at 905 (1951)).  Thus, "'[i]f one party to a contract, either wilfully or by mistake, demands of the other a performance to which he has no right under the contract and states definitely that, unless his demand is complied with, he will not render his promised performance, an anticipatory breach has been committed.'"  Gilmore, 1998-NMCA-086, ¶ 16 (quoting Corbin, supra, § 973, at 910).

In this case, Eclipse's letter to Aviace dated September 13, 2006, evinces a definite and unequivocal statement that Eclipse intends to cancel the February 2007 delivery of the first aircraft ordered by Aviace because Aviace failed to pay the six-month production deposit of $634,305.95 as of the date of that letter.  But as noted above, neither Eclipse's letter of September 13, 2006, nor any of the parties' other correspondence, evince a definite and unequivocal intent by Eclipse to cancel the March 2002 agreement in its entirety or to cancel the scheduled delivery of any of the other 111 aircraft listed in that agreement.

In this regard, I note that Eclipse's letter of September 13, 2006, only references $167,500 of the $2,010,000 initial deposit that Aviace paid in March 2002.  Thus, Eclipse's letter implies that Aviace remains current on its payment schedule for the remaining 11 early aircraft covered by that initial deposit.  Aviace has presented no evidence that Eclipse has

36

made additional demands for payment with respect to these 11 early aircraft or any of the 100 other aircraft listed in the March 2002 agreement.

For these reasons, Aviace's claim of anticipatory breach of contract is limited to the controversy surrounding the price, payment terms, and delivery schedule regarding the first aircraft scheduled for delivery by no later than February 2007.  To determine the likelihood of Aviace's success on the merits of this claim, the Court must evaluate whether Eclipse's demand for an additional deposit of $634,305.95 in September 2006 and its switching of production sequence numbers from 31 to 47 are permitted under the terms of the parties' agreement, or whether these actions constitute a demand for something to which Eclipse has no right under the contract.  See Gilmore, 1998-NMCA-086, ¶¶ 15-16.

In this case, the March 2002 agreement attached as Exhibit A to Plaintiff's *Amended Complaint*, and admitted as Exhibits 1 and H during the hearing on this matter, forms the basis for Plaintiff's claims.  To the extent that this agreement is clear and unambiguous on its face, New Mexico's parol evidence rule does not provide a basis for this Court to rely on extrinsic evidence as a means of modifying or amending its terms.  See C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 508, 817 P.2d 238, 242 (1991).  "The parol evidence rule is a rule of substantive law that bars admission of evidence extrinsic to the contract to contradict and perhaps even to supplement the writing."  Id. at 243, 817 P.2d at 509.

This rule does not, however, prohibit the Court from employing principles of contract interpretation that do not depend on evidence extrinsic to the written agreement itself.  For example, the Court may rely on "traditional rules of grammar and punctuation," or assign

37

significance to particular language based on where it is placed in the contract. Id. at 244 n.5, 817 P.2d at 510 n.5.

The parol evidence rule also does not prohibit the Court from hearing "evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance" for the purpose of determining "whether a term or expression to which the parties have agreed is unclear." Id. at 508-09, 817 P.2d at 242-43. "The operative question then becomes whether the evidence is offered to contradict the writing or to aid in its interpretation." Id. at 509, 817 P.2d at 243 (footnote omitted).

In this case, the parties dispute the meaning of the provisions of the March 2002 agreement which address the timing of payments for the first aircraft in the delivery schedule. They also dispute whether subsequent correspondence between the parties had the effect of modifying, amending, or clarifying ambiguity in the March 2002 agreement with respect to the assignment of production sequence numbers and price increases.

I first address the dispute over the timing of payments for the first aircraft in the delivery schedule. Aviace claims that the parties' agreement only requires a 20% initial deposit (which Aviace already paid) for the first 12 aircraft in the delivery schedule, and that no additional payments are due until Eclipse actually delivers the first aircraft to Aviace. Eclipse takes the position that Aviace must make an additional deposit for each aircraft (including the first 12) to bring the total amount paid up to 60% of the purchase price by no later than six months before the delivery date.

Although there is some room for ambiguity in the wording of the March 2002

38

agreement, I find more support for Eclipse's interpretation of the payment terms.  The critical sentence in the March 2002 agreement states that:  "Additionally, six months prior to each aircraft delivery, Aviace AG will increase the deposit by 50% to a total deposit of 60% (the 'Six Month Production Deposit')."  [Ex. A to Doc. 16.]  This sentence plainly states that it applies to "each aircraft," not just the 100 aircraft that appear later in the delivery schedule.

To support a contrary interpretation, Aviace points to the "50%" figure contained in this sentence.  According to Aviace, this figure does not make sense as applied to the first 12 aircraft in the delivery schedule because earlier provisions of the March 2002 agreement provide for a 20% initial deposit on the first 12 aircraft, and thus Aviace would only need to increase its deposit by 40% to bring its total deposit up to 60% with respect to each of those 12 aircraft.

I conclude, however, that the failure to include the 40% figure as well as the 50% figure in the sentence establishing the six-month production deposit is simply an inadvertent drafting error that does not evince an intent by the parties to exempt the first 12 aircraft from the requirement of bringing the total deposit up to 60% of the purchase price six months before the delivery of "each aircraft."  To the extent that the ambiguity created by the 50% figure can be resolved by extrinsic evidence, I find that the testimony of the parties who actually negotiated the contract (Mr. Hilmarsson and Ms. Hall), as well as the relevant usage of trade, course of dealing, and course of performance supports Eclipse's interpretation in this case.  In this regard, I also find that the respective testimony of Mr. Hilmarsson and Ms. Hall was consistent.

This testimony, as well as the correspondence leading up to the March 2002 agreement, reflect that both Mr. Hilmarsson and Mr. Hall had an active role in suggesting the language and terms to be included in that agreement.  The parties' contract negotiations do not present a situation where Aviace was simply presented with a boilerplate contract under circumstances where it lacked the opportunity or capacity to review the contract terms and negotiate for a better deal before signing it.

Elsewhere the March 2002 agreement refers to a "Sterling Deposit Program" and "Most Favored Customer" status that are common features of Eclipse's contracts with other purchasers of the "Eclipse 500" aircraft.  The parties have not presented any evidence that Eclipse's other customers, or purchasers within the general aviation industry generally, routinely pay only a 20% deposit before delivery of the aircraft they purchase.  The 60% deposit coincides with the actual start of production on the particular aircraft for which the deposit is paid, which is a logical point for an aircraft manufacturer to demand additional payment in order to ensure that a customer is serious about taking delivery of a particular aircraft and will not cancel the order after the aircraft is built to the customer's specifications.

I next turn to Aviace's claim that its agreement with Eclipse guarantees delivery of the exact production-sequence numbers listed in Eclipse's fax transmittals of August 2002 and September 2002.  There is no reference to production-sequence numbers in the four corners of the March 2002 agreement, and thus Aviace relies on extrinsic evidence to support its contention that specific production numbers (as opposed to just delivery dates) are included in its agreement with Eclipse.

I find no credible support for this contention in the evidence of record.  The March 2002 agreement refers to the delivery of particular aircraft by date and not by production-sequence number.  Further, the text of the August 2002 and September 2002 fax transmittals does not indicate that they constitute a subsequent agreement or guarantees of a particular production sequence.  On the contrary, the August 2002 fax transmittal states that:  "Upon reviewing our agreement, I find that it was not intended to be a preliminary agreement, but rather to define the entire relationship between our two parties.  Given this, we do not see a need to create a subsequent agreement."  [Ex. 8.]  And the September 2002 fax transmittal states that:  "these numbers could change, if we change production rate for 2006."  [Ex. 10.]

There is no evidence that Aviace provided any additional consideration to support an amendment of the agreement guaranteeing the specific production-sequence numbers  listed in Eclipse's fax transmittals of August 2002 and September 2002.  As of the dates of those fax transmittals, the only consideration Aviace had given Eclipse was the initial deposit required under the March 2002 agreement, and there is no credible evidence that Eclipse guaranteed Aviace the set of production-sequence numbers contained in the later fax transmittals in exchange for the payment of that initial deposit or for the purpose of enabling Aviace to resell the aircraft.  On the contrary, the express purpose of the contract is to enable Aviace to own and operate a fleet of aircraft for use in a "jet club" or fractional-ownership business, and the limited purpose for which the production-sequence numbers were offered was to facilitate Aviace's bank-financing efforts.

While it may be common in the general aviation industry for aircraft purchasers to

41

receive a specific production number when placing a substantial deposit on a specific aircraft that is to be built to their specifications, the agreement at issue here is distinguishable from such typical purchases because it contemplates the purchase of a fleet of 112 aircraft years before production ever began, secured by no more than a 20% deposit on the first twelve aircraft.   Thus, the more reasonable interpretation of the agreement is that a definitive production-sequence number for each aircraft would not be provided unless and until Aviace is invoiced for the six-month production deposit on that aircraft.   The evidence of record at the hearings in this matter shows that Eclipse provided a specific production number when invoicing Aviace for the six-month production deposit on the first aircraft.

Finally, to construe the parties' writings as guaranteeing Aviace both a particular delivery date (calculated from the start of Eclipse's production of the Eclipse 500 aircraft) *and* a particular set of production-sequence numbers would lead to an absurd result that is contrary to the intent of the March 2002 agreement as well as the relevant usage of trade, course of dealing, and course of performance in the general aviation industry.   If Eclipse were to guarantee Aviace both a delivery date and a production sequence number for each of the 112 aircraft at issue here, then Aviace would effectively control Eclipse's production rate, because Eclipse could not increase its production rate without throwing off its delivery schedule to Aviace.

Because Eclipse decided to increase its production rate so that more aircraft will become deliverable more quickly after production begins, the production-sequence numbers listed in Eclipse's fax transmittals will become available for delivery in a shorter period of

time than the parties bargained for in the March 2002 agreement.  If Eclipse can deliver these production-sequence numbers in a shorter time frame, then the schedule of Aviace's deposits and other payments on those production-sequence numbers could be accelerated to a time frame much shorter than what the parties specifically agreed upon in the March 2002 agreement.  But if Eclipse demanded earlier payments and deposits from Aviace and advanced the delivery schedule for all 112 aircraft in this manner, then Aviace could claim that Eclipse was breaching the terms of the March 2002 agreement.

Under Aviace's interpretation of the agreement, there are only two ways for Eclipse to avoid this result.  First, Aviace could guarantee not only the production-sequence numbers, but also the rate of production, so that the specific production-sequence numbers claimed by Aviace become available for delivery at exactly the time frame contemplated in the delivery schedule set forth in the March 2002 agreement.  By effectively controlling Eclipse's production rate in this manner, Aviace would be able to control the number of aircraft that are available for other customers to purchase during the first three years of Eclipse's production.

The second option is for Eclipse to build the production-sequence numbers claimed by Aviace at a higher production rate, such that they are completed and available for delivery well in advance of the delivery schedule contained in the March 2002 agreement.  In order to comply with Aviace's interpretation of the agreement under this scenario, Eclipse would have to build, store, and finance these aircraft for a significant period of time until Aviace's payments and delivery schedule came due under the March 2002 agreement.

43

I find it implausible that Eclipse would have agreed to place itself in such a double-bind or give Aviace such extensive control of Eclipse's aircraft production during this period, especially considering that Aviace only paid an initial deposit of 20% of the purchase price on the first 12 aircraft in March 2002 and gave no consideration for the production-sequence numbers that Eclipse first provided in August 2002 and September 2002. As noted above, the parties' agreement does not contain any exclusivity provision or covenant not to compete that would guarantee Aviace a certain percentage of Eclipse's sales or a certain segment of the market for Eclipse's new aircraft. Rather, the agreement only contemplates that Aviace will receive a certain number of aircraft by certain months after deliveries begin. Thus, I conclude that the particular production-sequence numbers identified in the August 2002 and September 2002 fax transmittals are not included in the terms of the parties' agreement.

I reach a different conclusion with respect to whether the March 2002 agreement is subject to price increases such as that contemplated in the July 2005 memorandum and the August 2006 invoice. [Ex. 30; Ex. D to Doc. 16.] On this point, the critical language in the March 2002 agreement is as follows:

> The price to be paid for the Eclipse 500 aircraft will be $837,500 per aircraft delivered, in June 2000 dollars and subject to adjustments including certain List Price changes and Economic Price Adjustments ("EPA") as defined in the Sterling Deposit Program (*e.g.*, price guarantees, etc.) The $837,500 price is for the standard Eclipse 500 aircraft, as defined in the Sterling Deposit Program. Any optional equipment, maintenance or spare parts will be subject to separate negotiation and agreement.

> Eclipse Aviation Corp. ("Eclipse") will grant Aviace AG a "Most Favored Customer" ("MPC") guarantee on all aircraft, optional equipment, maintenance and spare parts (and related agreements) between the parties

whereby the price to Aviace AG will not exceed, and the terms for Aviace AG will not be more onerous than, the price(s) and terms which may be granted by Eclipse to any other customer purchasing (or proposing to purchase) aircraft in similar or smaller quantities and under similar terms.

[Ex. 1, H.] It is apparent from this language that the list price for the Eclipse 500 aircraft is subject to change over time, and that the rules governing such price changes depend in part on evidence outside the four corners of the March 2002 agreement itself, such as the "Sterling Deposit Program" and the "Most Favored Customer" status, which refer to Eclipse's dealings with other customers. With respect to Aviace's "Most Favored Customer" status, the evidence of record shows that Eclipse's price increases apply to other similarly situated customers as well.

Portions of Eclipse's "Sterling Deposit Program" provide the rules under which Aviace could have obtained a refund of its initial deposit on the twelve Early Aircraft in response to the unanticipated price increases and delays occasioned by the engine change. Portions of the "Sterling Deposit Program" also explain the difference between the List Price supplied at the time the contract is signed and the Final Delivery Price supplied when the customer is invoiced for the Six Month Production Deposit. Applying the rules of this program, Aviace declined Eclipse's refund offers and elected to accept the increase in the List Price reflected in the July 2005 memorandum. Aviace's July 2005 memorandum evinces an intent to modify the March 2002 agreement by changing the List Price from $837,500 to $1,045,000 (including the intervening price increase to $950,000). [Ex. D to Doc. 16.]

For all of the above reasons, I conclude that Aviace has not shown a substantial likelihood that it will prevail on the merits of the claims set forth in the *Amended Complaint*. The contract terms are straightforward, and the testimony of the parties who actually negotiated the March 2002 agreement (Mr. Hilmarsson and Ms. Hall) are credible and consistent with one another. Thus, the evidence of record here does not raise serious or difficult questions of contract interpretation that would weigh in favor of granting preliminary injunctive relief at this time.

While the analysis set forth above is directed primarily at Aviace's claim for anticipatory breach of contract, it applies to the other claims listed in the *Amended Complaint* as well. The common premise underlying these claims is that Eclipse made certain legally binding representations regarding the pricing, timing of payments, and production sequence of its aircraft and then acted contrary to those representations when it demanded payment of $634,305.95 for the 47th aircraft in its production sequence in September 2006. For purposes of evaluating Aviace's application for a preliminary injunction, I do not accept this premise.

### E.   Balance of Hardships

In addition to the harm that Aviace is likely to face if a preliminary injunction is denied, the Court also must consider the harm that Eclipse is likely to suffer if preliminary injunctive relief is granted. As Judge Posner explains,

> A district judge asked to decide whether to grant or deny a preliminary injunction must choose the course of action that will minimize the costs of being mistaken. Because [s]he is forced to act on an incomplete record, the

46

> danger of a mistake is substantial.  And a mistake can be costly.  If the judge grants the preliminary injunction to a plaintiff who it later turns out is not entitled to any judicial relief--whose legal rights have not been violated--the judge commits a mistake whose gravity is measured by the irreparable harm, if any, that the injunction causes to the defendant while it is in effect.  If the judge denies the preliminary injunction to a plaintiff who it later turns out is entitled to judicial relief, the judge commits a mistake whose gravity is measured by the irreparable harm, if any, that the denial of the preliminary injunction does to the plaintiff.

Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd., 780 F.2d 589, 593 (7th Cir. 1986).  To minimize the costs of being mistaken, the Court must balance the hardships that are likely to befall each party in the event that the Court's ruling on the application for preliminary injunction turns out to be incorrect.  See id.

Here the likelihood that Eclipse will suffer irreparable harm if the preliminary injunction is erroneously granted is significant.  In contrast to the scope of Eclipse's current demands--which only concern the six-month deposit on the first aircraft scheduled for delivery in February 2007--the preliminary injunctive relief requested by Aviace is very broad and essentially forces Eclipse to abide by Aviace's interpretation of the agreement with respect to all 112 aircraft listed therein over the course of the entire three-year delivery schedule, unless the merits of the action are fully decided before then.

Under Aviace's interpretation, no additional deposits are required before the delivery of the first 12 aircraft, and the delivery of those 12 aircraft is scheduled to occur within the next two years.  Thus, Aviace's interpretation of the agreement requires Eclipse to bear the risk that Aviace will not be able to make the remaining 80% of the payments due on those first 12 aircraft, and if Aviace fails to make those payments, then Eclipse will have to bear

47

the cost of storing those aircraft, finding new customers to purchase them, and reconfiguring the aircraft to meet the new customers' specifications.

More importantly, Aviace's interpretation of the agreement requires Eclipse to guarantee delivery of certain production-sequence numbers within a specific time frame, thereby effectively controlling Eclipse's production rate for the next three years. During this period, Eclipse may be effectively prohibited from increasing its production rate, and thereby selling more planes to more customers, because to do so would throw off the delivery schedule set forth in its March 2002 agreement with Aviace. The only way for Eclipse to avoid ceding control of its production rate to Aviace under this scenario without upsetting the delivery and payment schedule in the March 2002 agreement would be for Eclipse to build Aviace's 112 aircraft at a date earlier than the delivery date contemplated in that schedule and then store and finance these aircraft until Aviace's payments on those aircraft become due under the agreement. Altering the production schedule or storing and financing a significant number of aircraft until Aviace is ready to take delivery of them presents a substantial risk of harm to Eclipse.

I must also take into account that Aviace's interpretation of its March 2002 agreement with Eclipse ignores the express purpose stated in the first paragraph of that agreement, which is to allow Aviace to launch a fractional ownership program in Europe. Under Aviace's interpretation, Eclipse would have no recourse if Aviace abandoned its plans for a fractional ownership program in Europe and instead entered into direct competition with Eclipse by reselling the 112 aircraft listed in the March 2002 agreement to other customers

48

in the United States and elsewhere.  As indicated in the authorities cited in <u>Dominion Video</u> <u>Satellite</u>, 356 F.3d at 1263, such efforts by Aviace to siphon away portions of Eclipse's customer base through resale of the aircraft could harm Eclipse in several ways.  Eclipse specifically sought to protect against such harms when it included the fractional-ownership language in the March 2002 agreement and when it repeatedly rejected Aviace's requests to become a distributor or reseller of Eclipse 500 aircraft.

Finally, I note that even if Aviace sticks to its plan to launch a fractional ownership program in Europe, Aviace has not come forward with any evidence of its financial status or existing customer base, nor has Aviace offered to post a bond in the event that the Court grants preliminary injunctive relief in this case.  At this point, the record shows that Aviace is basically a paper corporation with no discernible group of employees, established customer base, or assets that arise from sources other than its March 2002 agreement with Eclipse.  Thus, there is no showing that Aviace would be in a position to pay Eclipse the amounts due under the agreement, or any damages for breach of the agreement, in the event that a preliminary injunction is lifted at a later date when the merits of the case are decided.

The respective financial capabilities of the parties is a relevant consideration in balancing the hardships occasioned by an application for preliminary injunctive relief, because the likelihood of a party becoming insolvent before the merits are decided affects the Court's assessment of whether the other party's injuries could be compensated by an award of damages at a later date.  See <u>Am. Hosp. Supply Corp.</u>, 780 F.2d at 596-97 (reasoning that preliminary injunction was favored where the defendant was insolvent and

49

the plaintiff had posted a $5 million bond).  Here the evidence of Aviace's current status as a startup company or paper corporation presents a significant risk that Eclipse will be left without an adequate remedy at law if Eclipse is required to build 12 aircraft for Aviace and then Aviace does not make the remaining payments for those aircraft when they are ready for delivery.  For all of the above reasons, the balance of hardships weighs in favor of denying Aviace's application for a preliminary injunction.

F.    Public Interest

The public interest is the final factor to be considered in evaluating an application for a preliminary injunction.  In some cases, such as those involving the violation of constitutional rights or other rights which significantly affect the general public, this factor may weigh heavily in favor of granting preliminary injunctive relief.  See, e.g., Elam Constr., Inc., 129 F.3d at 1347. But the case at bar involves a private commercial dispute surrounding the sale of new aircraft that few members of the general public will have occasion to fly in the immediate future, regardless of whether the aircraft are marketed through Aviace's fractional ownership business in Europe or through other customers of Eclipse.  Ordinarily, private commercial disputes over the terms of a contract are remedied through an award of compensatory damages, rather than injunctive relief.  See Am. Hosp. Supply Corp., 780 F.2d at 594.   To the extent there is any public involvement in the parties dispute, the public interest weighs in Eclipse's favor because Eclipse is the party with a definite, existing pool of customers (other than Aviace) and employees whose interests could be significantly harmed if Aviace's application for a preliminary injunction is granted.

Thus, I conclude that the public-interest factor does not weigh in favor of granting Aviace's application for preliminary injunctive relief in this case.  And because Aviace has not made a strong showing as to any of the four equitable factors relevant to this application, I conclude Aviace is not entitled to the preliminary injunctive relief it requests at this time.

My decision on this point is, of course, limited to the evidence in the record as of this date, which shows that Eclipse only intends to cancel delivery of one aircraft to Aviace based on Aviace's failure to pay the six-month production deposit for that particular aircraft.  I do not address the broader question of whether Eclipse may cancel the March 2002 agreement in its entirety due to any affirmative defenses or counterclaims that Eclipse may elect to assert in this action at a later date.

## III.  **CONCLUSION**

For the foregoing reasons, the Court concludes that Aviace has not clearly established that it lacks an adequate remedy at law or that the equitable factors discussed above weigh in favor of granting a preliminary injunction at this juncture.   Therefore, Aviace's *Application for Preliminary Injunction* must be denied.   This conclusion makes it unnecessary for the Court to address whether Aviace should be required to post a bond or other security under Fed. R. Civ. P. 65(c).

**IT IS THEREFORE ORDERED** that Plaintiff PA Aviace Ltd.'s *Application for Temporary Restraining Order and/or Preliminary Injunction* [Doc. 2] is **DENIED.**

**SO ORDERED** this 9th day of November, 2006, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge